NED W. MOSELEY AND MABEL BOWMAN MOSELEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 925–76.    Filed April 23, 1979.

*J. W. Green, Jr.*, for the petitioners.
*Michael W. Bentley*, for the respondent.

FEATHERSTON, *Judge:* Respondent alleges that there is a deficiency in the amount of $1,434.24 in petitioners' income tax for 1972.[1] Due to concessions made by petitioners, the only issue for decision is whether a distribution of $3,561.95 made to petitioner Ned W. Moseley under the "special reserve" provision of an insurance contract was, as respondent contends, ordinary income to the extent the distribution exceeded the total premiums of $384.80 credited to the "special reserve" account or, as petitioner argues, a nontaxable refund since the distribution was less than the total premiums paid under the policy.

### FINDINGS OF FACT

At the time the petition was filed, the address of petitioners Ned W. Moseley and Mabel Bowman Moseley was Stuttgart, Ark. They filed their joint Federal income tax return for 1972 with the Director of the Regional Service Center, Austin, Tex.

On or about February 12, 1951, Ned W. Moseley (petitioner) purchased from Pyramid Life Insurance Co. of Little Rock, Ark. (Pyramid), a $5,000 special 20-payment life insurance policy, which called for an annual premium of $192.40 and contained many of the usual provisions in life insurance contracts. The policy provided for dividends which were to be funded and distributed in the following manner:

(a) From the second through the fifth year of the policy, Pyramid would credit $96.20 of the annual premium to a special reserve, tontine account in the total amount of $384.80.

(b) The amount of the special reserve would be combined in a special reserve fund with amounts paid by others who purchased the same kind of policy during the same year. The insurance company would invest the fund in common stock of certain listed companies.

(c) All income from the common stock and accumulations attributable to stock splits, stock dividends, scrip dividends, purchase warrants, or rights to subscribe would be retained in the reserve and reinvested in additional stocks in the designated companies. Pyramid was authorized to sell any of the stock it

---

[1]The statutory notice determined a deficiency of $925.89. Respondent amended the answer to reflect the increased amount.

purchased and invest the proceeds in the stocks of other listed companies.

(d) At the end of the 20th calendar year after the date of the policy, a sum equal to the market value of all of the stocks in the special reserve would within 60 days be distributed by Pyramid as a dividend to the holders of the policies, issued during the calendar year 1951, for which the special reserve was set up, in which the persons named as insureds were then living, and whose policies were in full force on a premium paying basis, and on which all due premiums were paid. The dividend paid to the holder of each such policy would be in the proportion that the total amount set up in the special reserve for each policy bore to the total amount set up in the special reserve for all the then-remaining policies entitled to receive dividends from the special reserve.

(e) Each policyholder had an option to receive the distribution described in (d) above after 10 years. If the option was exercised after 10 years, the policyholder had no right to the dividend distributed after 20 years. If not exercised after 10 years, the option expired; in that case, the policyholder had no right to receive distributions until the end of the 20th year.

By a letter dated February 16, 1970, Pyramid informed petitioner that the premium on the policy was paid until February 12, 1971, which was the date the policy officially became paid up in the face amount of $5,000. The letter further stated that the policy would remain in force throughout petitioner's lifetime with a right to surrender the policy for the cost value or to place a loan against it at any time. The letter also pointed out that the policy provided for a single distribution at the end of the 20th calendar year that the policy was in force and that if petitioner was living on December 31, 1971, this distribution would be made within 60 days following the end of the 20th calendar year, in other words, by March 1, 1972.

By a letter dated February 15, 1972, Pyramid sent petitioner a check for $3,561.95 and stated that the check represented the 20th year special reserve distribution provided for in the policy. In addition, the letter stated that this check was the initial and final special reserve payment to which petitioner was entitled under the policy.

OPINION

Under the terms of the Pyramid life insurance contract, petitioner received a payment of $3,561.95 in 1972. According to petitioner, the payment constituted a refund of a portion of the aggregate premiums paid on the policy. Since the aggregate premiums, totaling $3,848, exceeded the amount of the payment, he argues, such payment is nontaxable under section 72(e)(1)(B).[2] Respondent would, on the other hand, separate the premiums credited to the "special reserve" account from those which funded the life insurance benefit. Because the payment received by petitioner in 1972 exceeded the aggregate premiums credited to the special reserve account, respondent maintains that the excess amount is taxable under section 72(e)(1)(B). Respondent further argues that the excess amount is taxable as ordinary income rather than as capital gain. In the event that the Court upholds respondent on these grounds, petitioner claims that the amount which he could have received upon exercising his option at the end of the tenth year, $1,870, should be considered constructively received in that year, which is now barred by the statute of limitations.

Section 72(e)(1)(B)[3] provides that if any amount is received under a life insurance contract and if that amount is not received as an annuity, the amount is included in gross income "only to the extent that it * * * exceeds the aggregate premiums or other consideration paid." Courts have construed this cost recovery rule of the predecessor of this section as excluding from income dividends received under a life insurance contract until amounts received under the contract exceed the aggregate premiums paid. *Helvering v. Meredith*, 140 F.2d 973, 974 (8th Cir. 1944), affg. per curiam a Memorandum Opinion of

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

[3] SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

(e) AMOUNTS NOT RECEIVED AS ANNUITIES.—

(1) GENERAL RULE.—If any amount is received under an annuity, endowment, or life insurance contract, if such amount is not received as an annuity, and if no other provision of this subtitle applies, then such amount—

(B) if subparagraph (A) does not apply, shall be included in gross income, but only to the extent that it (when added to amounts previously received under the contract which were excludable from gross income under this subtitle or prior income tax laws) exceeds the aggregate premiums or other consideration paid.

For purposes of this section, any amount received which is in the nature of a dividend or similar distribution shall be treated as an amount not received as an annuity.

this Court; see *Estate of Wong Wing Non v. Commissioner*, 18 T.C. 205, 209 (1952). Sec. 19.22(b)(2)–1, Regs. 103; sec. 29.22(b)(2)–1, Regs. 111.[4]

Since the amount of the special reserve distribution is less than that of "aggregate premiums" paid for the rights petitioner acquired under the policy, the statute appears to compel a holding for petitioner. However, respondent maintains that the special reserve and death benefit provisions constitute two distinct and economically independent policies. Hence, he would have us hold that the section 72(e)(1)(B) term "aggregate premiums," as applied to the facts of this case, refers only to those premiums credited to the special reserve account. We do not agree.

In our view, the special reserve provisions are inseparable from the life insurance provisions of the policy. As we interpret the testimony of one of Pyramid's officials, the company did not offer for sale a policy which contained only the special reserve provisions. Petitioner could not, therefore, have purchased the special reserve benefits without the life insurance benefits.

During the second through the fifth years of the policy, one-half of the annual premiums was credited to the special reserve account. Yet the policyholder acquired no vested rights in that account prior to his right to receive dividends at the end of 20 years or, at his option, at the end of 10 years. At those times, the policyholder was entitled to receive dividends from the special reserve account only if the insured was then living, the policy was in full force on a premium paying basis, and all due premiums had been paid. The policy would not be in full force on a premium paying basis, and rights to special reserve dividends would be forfeited, if the holder exercised his option, available at any time after the end of the third year, to surrender the policy for its cash value, for paid-up insurance, or for extended term

---

[4]Although the statutory language and accompanying committee reports deal mainly with contracts containing an annuity feature, S. Rept. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess. 11–12 (1954), courts have assumed that taxation of gain realized on surrender or exchange of life insurance or endowment policies lacking such a feature is governed by sec. 72(e). See *Gallun v. Commissioner*, 327 F.2d 809, 810 (7th Cir. 1964), affg. a Memorandum Opinion of this Court. *Barrett v. Commissioner*, 42 T.C. 993, 998 (1964), affd. 348 F.2d 916 (1st Cir. 1965). Statements by commentators support a conclusion that sec. 72, like its predecessor, treats dividends paid before the maturity or surrender of a policy as a reduction of premium cost. J. Convey, "Income Tax Problems Relating to Life Insurance," 13th Ann. N.Y.U. Inst. 233, 245 (1955); J. Pyle, "Income, Estate and Gift Taxation of Life, Accident and Sickness Insurance and Annuities under the 1954 Code," 5th Ann. Tul. Tax Inst. 467, 492–493 (1956).

insurance. Having paid all premiums credited to the special reserve account, the policyholder would nonetheless lose all rights to the special reserve distribution if he failed to pay any other premiums due under the policy. Thus the second and third conditions for the receipt of special reserve benefits relate to the status of the policy as a whole, a fact which underscores the interdependence of the special reserve and life insurance provisions.

Furthermore, premiums credited to the special reserve account would not under specified circumstances be differentiated from other premiums. Petitioner's policy did not cover the risk of death from suicide within 2 years from its date. If the insured committed suicide within 2 years, Pyramid was obligated to "return the premiums actually paid." The terms of the policy do not exclude from this refund of premiums any sum credited to the special reserve account.

An examination of the policy provisions thus disproves respondent's argument that the special reserve and death benefit provisions constitute distinct and economically independent policies. Rather the two sets of rights were tied together under one contract. Hence, the term "aggregate premiums" in section 72(e), as applied to the facts of this case, refers to all premiums paid under the policy, including the portion credited to the special reserve. The dividend from the special reserve account merely had the effect of reducing the total premiums paid for the policy. We conclude, therefore, that the dividend received under the special reserve provision constituted a partial recovery of the premiums paid for all rights under the policy.

In support of his argument, respondent cites *Fidelity-Philadelphia Trust Co. v. Smith*, 356 U.S. 274 (1958), in which the issue was whether annuity payments were deemed to arise under a life insurance policy issued simultaneously with the annuity contract and were thus includable under the predecessor section of section 2036 in the annuitant's estate. Although each life insurance policy was issued only on condition that the insured purchase an annuity contract which served the company as a hedge against the life insurance liability, the Court refused to hold that the annuity and life insurance policies constituted a single contract. The Court noted that the annuities could have

been acquired separately and annuity payments were chargeable to the annuity rather than to the life insurance contract.[5]

Although the *Fidelity-Philadelphia Trust* holding was reached in the context of a different legal issue, we agree with respondent that the analysis is applicable here. Yet that analysis does not support respondent's position. It is true that the 1972 payment is chargeable to the special reserve account and thus to only a portion of the premiums. However, as we have noted above, petitioner could not have purchased the special reserve benefits without the life insurance benefit.

To bolster his argument, respondent observes that petitioner may at some time in the future surrender the policy for its cash value and, in computing his gain, offset the amount of premiums not allocable to the special reserve fund against the cash surrender value. This fact does not, however, strengthen respondent's case. As we view the issue in controversy, petitioner would, upon a future surrender of the policy, recognize gain in the amount by which the total cash surrender value plus the special reserve distribution received on February 15, 1972, exceeded the aggregate premiums paid. In other words, sustaining petitioner's position in this case will not provide for any unwarranted nonrecognition of gain. If the policy were held until death, section 101(a) would eliminate recognition. Respondent has advanced no argument that these alternatives would contravene the legislative purpose of the statute.

Having disposed of the case on this ground, we do not consider other arguments raised by the parties.

*Decision will be entered under Rule 155.*

---

[5]The Court also relied in part on the fact that the contracts were formally separate. There are, of course, situations in which two formally separate contracts are treated as one. *Kess v. United States*, 451 F.2d 1229, 1231 (6th Cir. 1971); *Estate of Montgomery v. Commissioner*, 56 T.C. 489, 496–497 (1971), affd. 458 F.2d 616 (5th Cir. 1972), cert. denied 409 U.S. 849 (1972). Conversely, we recognize one document may embody two contracts. For the reasons stated in the text, however, we do not think that such a situation exists in the instant case.